UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TERESA M. SHANNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 01 C 9711 |
| | ) | Judge Joan H. Lefkow |
| HOTEL EMPLOYEES AND | ) | |
| RESTAURANT EMPLOYEES | ) | |
| INTERNATIONAL UNION and | ) | |
| HOTEL EMPLOYEES AND | ) | |
| RESTAURANT EMPLOYEES | ) | |
| LOCAL 1, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Teresa M. Shannon ("Shannon"), alleges in her three-count Amended Complaint that defendants, Hotel Employees and Restaurant Employees International Union ("International Union") and Hotel Employees and Restaurant Employees Local 1 ("Local 1"), violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, by discriminating against her on account of her sex and by retaliating against her for complaining of said discrimination (Counts I and II, respectively), and that defendants violated the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), by providing more compensation and benefits to her male counterparts than to her (Count III). Defendants move for summary judgment on all counts. For the reasons stated below, the motion is granted in part and denied in part.

### SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## FACTS

### A. Shannon's Employment

Local 1, an affiliate of the International Union, is a labor union representing workers in the hospitality industry in the Chicago area and workers in the Chicago Public Schools ("CPS") cafeterias. (Def. L.R. 56.1 ¶ 2, 51.) In 1992, Local 1's then-President, Thomas Hanley ("Hanley"), hired Shannon as a part-time organizer. (*Id.* ¶ 10.) In March 1993, Local 1 hired Shannon as a full-time business representative with an annual salary of $35,000. (*Id.* ¶ 7, 11.) In this position, Shannon was responsible for representing employees at Empress Casino. She also organized employees at other Illinois-Indiana casinos and at restaurants in the Chicago area. (*Id.* ¶

11.) Local 1's management regarded Shannon as "on the top tier" of Local 1's business representatives—"the best of the lot." (Pl. St. of Add'l Facts ¶ 2.)

Between 1994 and 1998, Shannon – a resident of Shorewood, Illinois – worked from a satellite office in Joliet, Illinois, though she occasionally traveled to Local 1's main office in Chicago for meetings on Fridays. (Def. L.R. 56.1 ¶ 2, 13.) She used her own vehicle for work-related travel, but she does not recall whether she received reimbursement from Local 1 for such travel. (*Id.* ¶ 11; Shannon Dep., at 43.) Local 1 did provide Shannon with a pager for use in performing her employment responsibilities. (*Id.* ¶ 18.) Local 1 also provided Shannon with pension benefits vesting under multiple benefit plans. (*Id.* ¶ 47.)

In July 1993, while Shannon was still working for Local 1, the International Union hired Shannon as an international organizer with a separate, additional annual salary of $35,000. (*Id.* ¶ 12, 14.) In this position, Shannon assisted in organizing workers at casinos in Joliet and several other locations, including East St. Louis, Illinois, Davenport, Iowa, and Alton, Illinois. (*Id.* ¶ 14.) The International Union provided Shannon with a leased automobile for work-related travel. (*Id.* ¶ 12.) The International Union also provided Shannon with a cellular telephone until it was stolen in 1998. The International Union did not replace the phone. (*Id.* ¶ 17; Shannon Dep., at 171-72.)

In 1998, Shannon's duties as a business representative for Local 1 changed. She was no longer responsible for representing union members employed at the Empress Casino. Instead, she became responsible for representing union members employed by Levy's Restaurants at McCormick Place, a convention facility in Chicago, for organizing workers at Connie's Pizza at McCormick Place, and for working on a downtown Chicago hotel project. (*Id.* ¶ 16.)

During the period in which Shannon was employed by both Local 1 and the International

Union, Local 1 employed eight men who were comparable to Shannon in terms of employment duties. These men, along with their total compensation from Local 1 for years 1998 and 1999, are listed below:

| Name | 1998 Earnings | 1999 Earnings |
| --- | --- | --- |
| C. Broniarycyck | $64,894.11 | $64,726.84 |
| D. Tsnenekos | $61,621.49 | $40,184.87 |
| C. Wilkins | $65,771.20 | $62,554.25 |
| J. O'Gara | $49,859.55 | $53,459.87 |
| M. Snyder | $46,872.91 | $52,335.46 |
| J. Davern | No information | $59,919.54 |
| H. Lewis | $48,528.64 | $52,116.56 |
| D. Wilson | $37,324.87 | $41,599.34 |

(Def. Ex. 13-14.)  Shannon earned $36,700 from Local 1 in 1998 and $37,108.54 in 1999. (*Id.*) In 1998, Shannon also earned $40,640.76 from the International Union.  In 1999, she earned $33,393.03 from the International Union. (*Id.*)  Of the eight comparable males employed by Local 1, Shannon only knows of one who was also employed by the International Union: Mike Snyder. (Pl. L.R. 56.1 ¶ 61 and Pl.'s Resp.)  Snyder earned $16,000 from the International Union in 1998 and $18,000 in 1999. (Def. Ex. 13.)

On September 15, 1999, the International Union terminated Shannon and took back the car it had leased for her. (L.R. 56.1 ¶ 12; Shannon Dep., 55-56.)  Following her termination by the International Union, Shannon and Local 1 President Terrence Maloney ("Maloney") discussed changing Shannon's duties at Local 1 to include work on the "100% Union Project" (the "Project"), a program to identify employees at unionized establishments that were not paying

dues to Local 1. (*Id.* ¶ 19-20.) Maloney expected the Project to become a full-time assignment for Shannon. (*Id.* ¶ 19.) Shannon did preliminary work on the Project in late 1999 or early 2000. She recalled going to Levy's Restaurant and the Hyatt Hotel in Chicago to pick up lists of employees for work on the Project. (*Id.* ¶ 20.) At some point during this period, Maloney authorized Shannon to rent a car temporarily at Local 1's expense. (*Id.* ¶ 22.) The parties dispute whether Shannon needed a car to perform her job duties, or whether her primary need for a car was to commute from her home in Shorewood to the public train she used to travel to Chicago. (Pl. Statement of Add'l Facts ¶ 20 and Def.'s Resp.)

In Fall 1999, Shannon asked Maloney for a raise, but Maloney deferred her request until January 2000 because of Local 1's financial problems. (Def. L.R. 56.1 ¶ 21.)

## B. Local 1's Financial Condition and the Imposition of the Trusteeship

In August 1995, the United States filed suit against the International Union and its constituent entities seeking equitable relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* On August 21, 1995, the United States District Court for the District of New Jersey approved a consent decree between the United States and the International Union. The consent decree created and imposed an Ethical Practices Code with general and specific fiduciary obligations on the International Union and its constituent entities, including the obligation to assure that "union funds are not dissipated and are spent for proper purposes." (Def. L.R. 56.1 ¶ 24.) Pursuant to the consent decree, the court appointed Kurt Muellenberg ("Muellenberg") as Monitor of the International Union. (Def. Exs. 10-11.) The consent decree granted Muellenberg broad powers to investigate the activities of the International Union and its constituent entities and to implement remedial measures. (*Id.* 10.)

On August 26, 1998, Muellenberg issued a report to the District Court summarizing his

actions as Monitor for the period of September 5, 1995 to August 25, 1998. The Monitor's report criticized the International Union's car-leasing practices with recommendations for reform, questioned the International Union's employment of over 100 employees classified as "organizers" without adequate supervision, analyzed Local 1's poor financial condition and overstaffing, and addressed Local 1's maintenance of a fleet of sixteen leased vehicles despite its chronic inability to meet other financial obligations. (Def. L.R. 56.1 ¶ 27.) Muellenberg also noted that "Local 1 should have been placed in trusteeship many years ago." (Def. Ex. 11.)

Apparently because of Muellenberg's report, Local 1's then-President, Thomas Hanley, left office and was replaced by Maloney. (Def. L.R. 56.1 ¶ 30.) Local 1's financial problems worsened after Maloney became President. Local 1's cash assets dropped from $175,000 in 1997, to $75,000 in 1998, and finally to $33,000 in 1999, and its net assets remained at negative $1 million through 1999. Local 1 was in default in making pension contributions for its employees, owing at least $100,000. In addition, by November 1999, Local 1 owed $40,000, combined, to the Illinois State and Chicago Federations of Labor and thousands of dollars in fees for professional services. (*Id.* ¶ 31.) Still, with the exception of discontinuing the provision of two leased cars to Local 1's female office manager and a male bookkeeper, Maloney undertook no specific remedial actions. (*Id.* ¶ 32.)

On November 29, 1999, International Union President John Wilhelm ("Wilhelm") placed Local 1 under trusteeship, at least partially because of its financial condition. Wilhelm assigned Henry Tamarin ("Tamarin") as trustee. All of Local 1's officers were suspended from elected union office, but the trusteeship initially retained all employees, including Maloney, in their full-time employment without a reduction in pay. (*Id.* ¶ 33.)

After becoming trustee, Tamarin discovered that Local 1's finances were "in worse shape

than anticipated." Although Local 1 had an annual budget of approximately $4 million, it had accrued debt of $1 million. Local 1's monthly bills totaled approximately $330,000, but Local 1, as of December 1999, had only $30,000 on hand to pay bills. (*Id.* ¶ 34.)

## C. Remedial Actions During Local 1's Trusteeship

After the trusteeship began, Local 1 took immediate steps to trim expenses. First, Tamarin reduced by ten percent the salaries of all employees who received more than $50,000 per year. (*Id.* ¶ 44.) Tamarin also announced that none of the leases for automobiles used by employees would be renewed. (*Id.* ¶ 37.) Each Local 1 employee was instructed to provide the trustee with a written explanation for his or her need for an automobile at Local 1's expense.[1] On December 8, 1999, Shannon reported that she felt she needed Local 1 to provide her with a vehicle because she commuted fifty miles from her home to Local 1's offices, because her personal financial condition would make it difficult for her to finance a vehicle, and because she anticipated visiting all of the locations where Local 1 members worked to complete her duties on the Project. (*Id.* ¶ 38.) Tamarin disagreed that Shannon needed an automobile to perform her job duties and, on December 30, 1999, he informed Shannon that her rental car would be discontinued. As other automobile leases expired, the pool of available automobiles shrunk, and Tamarin reassigned the remaining cars based on his determination of the employees' need to drive for Local 1 business.[2] (*Id.* ¶ 39.)

---

[1] In an undated, handwritten statement, James Davern, a Local 1 business agent who was provided with a car a Local 1's expense, states that he was never asked to provide a written statement justifying his need for a car. The court will not consider Davern's statement because it is neither notarized nor does it state that it is made under penalty of perjury. *See DeBruyne* v. *Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 471 (7th Cir. 1990) (holding that a statement not made subject to the penalties for perjury may not be considered by the court on a motion for summary judgment).

[2] Shannon claims that Tamarin also discontinued McPartlin's use of a Local 1 vehicle and reassigned it to a male employee. (Pl. St. Add'l Facts ¶ 23.) McPartlin admits, however, that she offered to use her own vehicle, which she had purchased in anticipation of her impending retirement. (McPartlin Dep., at 75.) Local 1 reimbursed McPartlin for mileage driven in her personal vehicle on Local 1's behalf at 31 cents per mile. (Tamarin Dep, at 140.)

Shortly after the trusteeship was imposed, two males left Local 1's employment–one by retirement and another by termination. Local 1 did not replace either employee. (*Id.* ¶ 41.)

Two female employees received pay increases during the initial period of the Local 1 trusteeship. Juana Nowakowski, who spoke Spanish, moved from part-time to full-time status and received a commensurate pay increase because of her ability to serve Local 1's many Hispanic members. (*Id.* ¶ 42.) Geraldine McPartlin ("McPartlin") also received a raise. From 1976 until her retirement in September 1999, McPartlin was employed by the International Union, although she mainly worked as a business agent serving Local 1 members in the Chicago Public School ("CPS') cafeterias. After her retirement from the International Union, Maloney hired McPartlin to continue to do the same full-time work for $1,000 per month. When Tamarin became trustee, he raised her annual salary for her full-time work from $12,000 to $35,000, making her pay roughly equal to Shannon's. (*Id.* ¶ 43.)

## D. Shannon's Employment at Local 1 During the Trusteeship and Her Termination

When Shannon was an employee of the International Union, she participated in the International Union Pension Fund. Shannon admits that she properly received pension benefits arising from her employment with the International Union. As a Local 1 employee, Shannon became a vested participant in two additional pension plans: the Officers and Employees of the Local Union of the Hotel Employees and Restaurant Employees International Union Pension Fund ("OEL Fund") and the rank-and-file Hotel Employees and Restaurant Employees International Union Pension Fund ("Pension Fund"). Local 1 paid contributions on Shannon's behalf to the Pension Fund for the period from November 1, 1992 to December 31, 1994 and during the trusteeship (September 1, 1999 to June 1, 2000). Local 1 omitted $3,794 in payments on Shannon's behalf to the Pension Fund for the period from December 1994 to August 1999.

Shannon admits, however, that as a vested participant in the Pension Fund, the omission will not affect Shannon's retirement benefits. From the Pension Fund, she will receive a monthly benefit of $182 at normal retirement age, based upon the entire period of her employment with Local 1 from 1992 to 2000, in addition to full benefits from the OEL fund. (*Id.* ¶ 47.)

After the trusteeship was imposed, Shannon retained responsibility for representing some union members at McCormick Place. Shannon claims, however, that she received other assignments from Tamarin that she considered to be "demeaning." For example, Shannon was given "bulletin board decorating assignments . . . once or twice" and was asked to take photographs for Local 1. She was also occasionally assigned to assist members at Local 1's receptionist's window, handing out checks to banquet workers, taking dues payments, and answering members' questions. Shannon was asked to prepare an analysis of tip/gratuity income received by represented employees. While Shannon did not consider any of these individual assignments demeaning, the combination of assignments made her feel "like my value was being looked at in the wrong way by the local, that I was not the same person in their eyes as before they came, I was smaller." (*Id.* ¶ 45; Shannon Dep. at 166-171.)

On December 30, 1999, after Tamarin informed Shannon that her rental car would be discontinued, Shannon complained to Tamarin about the loss of the vehicle. Tamarin refused to reconsider his decision to discontinue Shannon's vehicle. (Shannon Dep., at 179.) Shannon then asked Tamarin about her pension, telling him that she was "under the impression that my pension was not in place from Local 1." (Shannon Dep. at 183-84.) Shannon claims that Tamarin told her that he could not "make every wrong right" and that Shannon was not "going to have two pensions." (Shannon Dep. at 178-184.) Both Shannon and Tamarin became angry, and Shannon claims that she told Tamarin, "I want you to know that this is discrimination and that other

women in the local are being discriminated against based on their wages, benefits, and working conditions." (Shannon Dep. at 184.) After a weekend or a long weekend, Tamarin communicated to Shannon that he would look into her pension "but no promises." (*Id.* at 187.)

In February 2000, the International brought in James Dupont ("DuPont") to assist Tamarin. (Pl. St. of Add'l Facts ¶ 32.) DuPont spent his first five or six days at Local 1 meeting with Tamarin so that Tamarin could "bring him up to speed on what [Tamarin] wanted him to do." During these meetings, Tamarin shared his "impressions about the staff" with DuPont. (*Id.* ¶ 33-34.) Tamarin did not provide DuPont any specific details about Shannon, however, only her name and current assignment. (DuPont Dep., at 36.)

Maloney testified that he noticed almost immediately after DuPont started at Local 1 that the "writing was on the wall" that DuPont wanted to "get rid of" Shannon. (Pl. St. of Add'l Facts ¶ 40.) Maloney stated that this impression was based on comments DuPont made to him directly. (Maloney Dep., at 39.) He also testified that Shannon was the subject of more criticism, scrutiny, and one-on-one meetings than other business representatives. (Pl. St. of Add'l Facts ¶ 41.)

In an electronic note dated February 14, 2000 (DuPont's first day at Local 1), DuPont wrote,

> Called to the office at 11 am. Terri [Shannon] was just showing up for work. When questioned, Terri said that she worked from 11 am to 5 pm on Mon, Wed, and Friday. I told her that was unacceptable and we would have to talk about this issue. Set a meeting with her for Wednesday to discuss hours, 100% union, and banquet information.

(DuPont Dep., at 99; Pl. Ex. 11.) Though DuPont did not produce any such notes on other employees, DuPont testified that he maintained similar notes on other employees on a laptop computer that was stolen. He testified that the note regarding Shannon was "probably" retained in paper form at Local 1 for Shannon's unemployment hearing. (DuPont Dep., at 117.)

Shannon testified at her deposition that she "felt belittled" by Tamarin and Dupont at

Local 1 staff meetings. She generally recalled that Tamarin "sort of snapped at me," but she could not provide any information about what Tamarin or Dupont said at the meetings. (Def. L.R. 56.1 ¶ 48.) One male employee, Clarence "Buddy" Broniarczyk, testified that he also "had problems" with Tamarin because Tamarin required him to "work harder than I was working." (*Id.* ¶ 49; Broniarczyk Dep. at 81-82.)

> On March 16, 2000, the International Union's Secretary Treasurer wrote to Shannon,
>
> Your termination from the International Union was effective September 15, 1999. However, due to an oversight, you continued to receive paychecks through October 31, 1999. The total amount of overpayment was $4,374.99. Deducting your 7 ½ days vacation pay brings the net overpayment to $3,655.79. Demand is hereby made for the return of these funds. Please contact my Administrative Assistant, Gary F. Leopold, in writing to make arrangements for the Return of these funds. Thanking you in advance for your immediate response . . . .

(Pl. App. 9.) Shannon testified that she did not receive the letter at that time. (Shannon Dep., at 124-28.)

On March 22, 2000, DuPont met with Shannon and advised her that he was assigning her responsibility for entering dues payments into a computer system, another assignment that contributed to Shannon's feeling demeaned. (DuPont Dep., at 106; Shannon Dep., at 169-71.) When Shannon questioned whether she would be able to perform dues entry because of a shoulder injury, DuPont asked her whether she was refusing an assignment. Shannon agreed to try the assignment, but was never given any dues entry work to do. (Pl. St. of Add'l Facts ¶ 51.)

On March 27, 2000, DuPont told Shannon to put her work on the 100% Union Project "on hold" because of some computer problems Local 1 was experiencing, though Shannon was performing work on the project without the use of a computer. (Pl. St. of Add'l Facts ¶ 67-68.) DuPont was aware that Shannon was working on the project as early as February 16, 2000. (*Id.* ¶ 69.) DuPont notified Shannon that she would receive a new assignment on April 8, 2000 and that she "must be prepared to carry out all work duties assigned to you. Use this time between now

and April 8 to get an automobile. It is your responsibility to have transportation to do your duties as assigned." (*Id.* ¶ 55 and Def. Resp.) When Shannon asked DuPont if she would be terminated if she did not get a car, DuPont responded that having a car was a condition of employment. (Pl. St. of Add'l Facts ¶ 59.)

On April 11, 2000, the International Union, through its general counsel, wrote to Shannon that if she did not respond to its earlier request for return of funds she allegedly had been overpayed, "the International Union will have no other recourse but to terminate your employment with Local 1, which is presently under the jurisdiction of the International Union due to its trusteeship." (Def. Supp. App. 12.) Shannon contacted Gary Leopold, an administrative assistant to the General Secretary-Treasurer of the International Union and informed him that she had never received the previous letter demanding return of the alleged overpayment. Leopold explained the alleged overpayment to Shannon, and Shannon informed him that "his numbers were wrong." (Shannon Dep., at 124-25.) As a result, the International Union adjusted its demand from $4,374 to $2,121. (*Id.* at 125.) Shannon does not recall any further contact with the International Union regarding the overpayment issue. (*Id.* at 125-128.)

In March or April 2000, Tamarin assigned Shannon to represent CPS cafeteria workers, because McPartlin was retiring as a full-time representative for the CPS cafeteria workers. Shannon's salary and benefits were not changed, though Local 1 agreed to provide her with an automobile at Local 1's expense because of the need to travel to the various schools. (Def. L.R. 56.1 ¶ 52-54.)

Shannon immediately voiced concerns about the areas in which she would have to travel for the CPS assignment, explaining that she perceived them as "high crime areas." Shannon did not know the names of specific areas of the city about which she had safety concerns, so she used

the general terms "west side" and "south side." (*Id.* ¶ 56.) At some point, Shannon told her supervisors that there were portions of the south and west side that she would service alone, but that she would not go into high-crime areas alone. Instead, she requested that she be permitted to bring another representative along with her when she visited schools in high-crime areas. (Shannon Dep., at 224.) On May 8, 2000, Shannon wrote a memo to Tamarin stating that she had "been to a couple of locations and seen some areas that the schools are located in. These areas I believe are very dangerous for a women [*sic*] alone." (Def. L.R. 56.1 ¶ 57.)

On or before April 26, 2000, Shannon asked Tamarin for a raise. Tamarin denied her request. (*Id.* ¶ 55.)

By memo dated May 9, 2000, DuPont responded to Shannon's safety concerns. He explained, "Use your own judgment in the field about your safety. If you have a valid reason for not visiting a school at a certain time, you have a right to keep yourself out of any unsafe situation. But you must give me an immediate, detailed report about what happened." DuPont explained that the 72 year-old McPartlin had had the CPS assignment for 27 years and that a majority of Local 1's members in the cafeterias were women. (*Id.* ¶ 59.) According to McPartlin, after 1999, a male business representative, James Dyson ("Dyson"), accompanied her to "maybe three schools" and she went alone to "maybe five schools." (Pl. St. of Add'l Facts ¶ 87.) Maloney confirmed that Dyson shared CPS responsibilities with McPartlin from early fall 1999 until shortly after the trusteeship was imposed. (Pl. St. of Add'l Facts ¶ 89.)

At a meeting with Tamarin and DuPont on May 23, 2000, Shannon stated that she wanted to "go on the record" that she would not go into the "south and west sides of the city." (Shannon Dep., at 315.) At another meeting on June 2, 2000, Tamarin and Dupont again met with Shannon and warned her that if she refused to accept the CPS assignment "the way it was," with "nobody

coming with" Shannon to schools she believed to be in high-crime areas, she would be terminated. (*Id.* at 326-28.) When Shannon refused to accept the assignment "the way it was," she was terminated. (Pl. Statement of Add'l Facts ¶ 86.)

Following Shannon's termination, McPartlin continued to work with CPS cafeteria workers. Carmen Dickinson, an International Union business representative with experience representing public school employees, began working with McPartlin. Dickinson visited the schools while McPartlin attended Chicago Board of Education meetings and did office work. (Pl. St. of Add'l Facts ¶¶ 90-91.) At some point, McPartlin informed her supervisors that she wanted to "do something different," so Tamarin "created [a] political job for her." McPartlin continued in this capacity on a part-time basis. (DuPont Dep., at 190-91; Tamarin Dep., 138-39.)

## DISCUSSION

### I. Title VII and Equal Pay Act Claims - Unequal Pay

#### A. Unequal Pay Claims for 1993 through September 15, 1999

Shannon alleges that she received less pay than male employees for equal work requiring equal skill, effort and responsibility under similar working conditions and that this wage disparity violates the Equal Pay Act and Title VII. Shannon does not, however, state whether her claims for equal pay relate solely to the period following her termination from International Union in September 1999 or whether her claims also cover the period from 1993 through September 1999 when she was separately employed by and receiving salaries from both International Union and Local 1.

Defendants contend that Shannon has no basis for a claim predicated on equal pay prior to her termination from International Union in September 1999. Defendants argue that Shannon's combined salary from International Union and Local 1 exceeded the salaries paid to the eight

male employees she identified as having performed comparable jobs during that time period.

The court's evaluation of the record leads it to conclude that Shannon waived any claims for equal pay prior to her termination from International Union. Shannon completely fails to respond to defendants' arguments on the issue or to develop any of her own. Defendants' argument was more than sufficient to put Shannon on notice that they were disputing the claim. Accordingly, Shannon's silence on this issue results in a waiver of any actual or potential claim for equal pay preceding her termination from International Union. *Volvosek v. Wis. Dep't of Agr., Trade and Consumer Protection*, 344 F.3d 680, 689 n.6 (7th Cir. 2003) (the total absence of argument regarding the plaintiff's termination waived consideration of the issue) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).

Furthermore, even if Shannon had addressed the issue, it is unlikely she could have raised a genuine issue of material fact. First, Shannon fails to identify comparable male employees for the years 1993 through 1997 and thus, provides the court with no basis on which to evaluate whether in fact a wage disparity existed during that time period. Second, as defendants point out, Shannon stated in her deposition that she did not become underpaid relative to comparable male employees until her termination from International Union in September 1999.[3]

The court grants defendants' motion for summary judgment on claims for equal pay from 1993 through September 1999.

## B. Equal Pay Act Claim for September 15, 1999 through June 2, 2000

---

[3] Shannon denies in her responses to Defendants' Rule 56.1(a)(3) Statement of Material Facts that she admitted in her deposition that she did not become underpaid in relation to male co-workers at Local 1 during the time before September 15, 1999. In support of her denial, however, Shannon cites to the same page of her deposition relied upon by defendants. In that deposition Shannon was asked, "And when did you become, in your view, underpaid relative to other employees?" Shannon responded, "As soon as I was terminated from the International Union." Shannon thus fails to sufficiently rebut defendants' factual allegations. (Shannon Dep., at 178-179.) *Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill., 2000) (nonmovant must cite specific evidentiary materials justifying denial) Fed.R.Civ.P 56, 28 U.S.C.A.; U.S. Dist. Ct. Rules N.D. Ill., General Rule 56.1(a).

Shannon bears the burden of producing evidence sufficient to establish a *prima facie* case for a violation of the EPA. To establish a *prima facie* case, Shannon must produce evidence that (1) different wages are paid to employees of the opposite sex; (2) employees do equal work that requires equal skill, effort, and responsibility; and (3) the employees have similar working conditions. *Gallo v. Advocate Health Care*, 2002 WL 1160957, *5 (N.D. Ill. 2002).

Defendants argued in their opening memorandum that Shannon failed to establish a *prima facie* case for unequal pay under the EPA because defendants' refusal to grant her a discretionary raise did not constitute an "adverse employment action." But, as Shannon correctly argues in response, the EPA does not require a plaintiff to establish that they have been subjected to an adverse employment action. Instead, a plaintiff need only produce evidence sufficient to satisfy the four elements identified above. Defendants' reply memorandum thus rightly abandons this argument and effectively concedes that Shannon did in fact become underpaid by Local 1 relative to comparable male employees upon her termination from International Union.

Thus, defendants' motion and Shannon's claim ultimately rest on the question whether defendants can produce evidence sufficient to show that the wage differential was due to one of the four defenses set forth in the statute. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S. Ct. 2223, 2229 (1974). The four defenses to an EPA claim are "(1) a seniority system; (2) a merit system; 3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The employer always bears the burden of proof on these affirmative defenses.

Defendants contend that the wage disparity between Shannon and her comparable male co-workers is based on a "factor other than sex." Specifically, defendants state that they refused to grant Shannon a raise upon her termination from International Union to make her salary commensurate with comparable male employees because Local 1 was suffering from a severe

financial crisis that rendered it fiscally unable to raise Shannon's salary.

The factor other than sex must be legitimate. "[A]n employer cannot use a gender-neutral factor to avoid liability unless the factor is used and applied in good faith; it was not meant to provide a convenient escape from liability." *Fallon v. State of Illinois*, 882 F.2d 1206, 1211 (7th Cir. 1989). The Seventh Circuit has suggested in dicta that an employer may rely on its financial difficulties as a factor other than sex to justify a disparity in pay between male and female employees. *Covington v. Southern Illinois University*, 816 F.2d 317. In *Covington*, a female professor sued her university employer under the EPA and Title VII, claiming that the university discriminated against her on the basis of sex by paying her less than her male predecessor. The plaintiff argued that the university could not rely on its financial difficulties as a defense because university policy stated that financial problems would not alter its obligations under the EPA. The Seventh Circuit choose not to resolve the issue because the university proffered other reasons for the disparity that sufficiently justified the difference in salary. Nevertheless, this court is persuaded that, at least absent a policy such as that at issue in *Covington*, the Seventh Circuit would find that an employer's financial difficulties excuse a pay disparity between female and male employees performing equal work.

In this case, Shannon does not dispute that an employer's financial difficulties constitute a legitimate factor other than sex justifying a wage disparity, nor that at the time of her termination from International Union, Local 1 was itself suffering from, at a minimum, a depressed and deteriorating financial condition. Indeed, both parties agree that although Local 1 had an annual budget of approximately $4 million, it had accrued debt of $1 million, and that Local 1's monthly bills totaled approximately $330,000, but Local 1, as of December 1999, had only $30,000 on hand to pay bills. (Def. L.R. 56.1 ¶ 34 and Pl. Resp.)

Instead, Shannon merely argues that despite its financial condition, Local 1 could have

obtained the necessary funds to raise her salary. First, Shannon contends that Local 1 could have raised her salary instead of raising the salaries of two other female employees, or simply directed part of a recently retired Local 1 employee's salary to Shannon. Alternatively, Shannon contends that Local 1 could have obtained funds from International Union in order to eliminate the wage disparity.

Shannon's argument seeks to impose on the defendants a level of proof unfounded in the statute or the case law. In effect, Shannon asks this court to reject defendants' affirmative defense if it finds that defendants had any capacity to raise Shannon's salary. This rule, if adopted, would effectively negate "financial difficulty" as an affirmative defense, because, as defendants note, absent insolvency, an employer would always have the capacity to reallocate resources to address a wage disparity.

The "any other factor other than sex" defense is a "broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Fallon v. State of Illinois*, 882 F.2d at 1211 (citing *Corning Glass Works v. Brennan*, 417 U.S. at 197, 94 S.Ct. at 2229)). In fact, the Seventh Circuit "does not require the factor other than sex be related to the requirements of the particular position in question or that it be a business-related reason []." *Id.* (quoting *Covington v. Southern Illinois University*, 816 F.2d at 321). The breadth of the defense "prevents courts and administrative agencies from substituting their judgment for the employer's judgment." *Id.* (citing *County of Washington v. Gunther*, 452 U.S. 161, 171, 101 S.Ct. 2242, 2249, 68 L.Ed.2d 751 (1981)).

Here, whether it was wise or prudent for defendants to deny Shannon's request for a raise, it was not in violation of the EPA. There is no evidence to suggest that defendants' perpetuation of the wage differential between Shannon and her male co-workers was anything other than a legitimate, non-discriminatory business response to Local 1's financial problems. If defendants

were unable to identify other measures taken to address Local's financial condition, the court would be more skeptical of defendants' proffered justification. But instead, both parties agree that the defendants took several measures to address Local 1's precarious financial condition. For instance, Local 1 reduced by 10% the salaries for all employees who earned more than $50,000 per year; declined to renew leases for automobiles used by employees; and required Local 1 employees to provide the trustee with a written explanation for his or her need for an automobile at Local 1's expense. (Def. L.R. 56.1 ¶ 37, 38, 44 and Pl. Resp.)

Shannon places great weight on the fact that despite its financial difficulties, Local 1 raised the salaries of two female employees. Shannon does not cite this fact to argue that Local 1 did not suffer from a financial crisis, but instead merely to show that Local 1 did in fact have the capacity to raise employee salaries. The flaw in Shannon's argument is that it essentially asks this court to engage in precisely the type of second guessing that district courts have been expressly instructed to avoid. *Fallon*, 882 F.2d at 1211. The court's review of the "other factor other than sex" defense is a limited review. *Id.* Defendants provide legitimate, non-gender related business explanations for their decision to raise the salaries of the two identified female employees and this court sees no reason to substitute defendants' judgment with its own.[4]

Shannon's claim that Local 1 could have obtained additional funds from International Union is similarly unpersuasive. In *Covington*, for instance, the Seventh Circuit did not require the public university employer to demonstrate that it was unable to obtain additional funds from the State of Illinois, alumni or any other funding source before excusing a prevailing wage disparity at the university. 816 F.2d at 324, 325. Likewise, Local 1 has no such obligation.

---

[4] Local 1 states that Geraldine McPartlin was given a raise because, despite the fact she was working full-time, she was being paid a mere $12,000 per year and Juana Nowakowski was given a raise because she was elevated to a full-time employee and possessed valuable bilingual skills. (Def. L.R. 56.1 ¶¶ 42, 43 and Pl. Resp.)

The Court is persuaded that defendants' have met their burden of establishing an affirmative defense to Shannon's claim for unequal pay. Consequently, defendants' motion for summary judgment as to Shannon's EPA claim is granted.

### C. Title VII Claim for September 15, 1999 through June 2, 2000

The parties fail to separately and specifically address Shannon's claim of unequal pay for equal work pursuant to Title VII. Nevertheless, whereas under Title VII a plaintiff bears the burden to prove intentional discrimination, the EPA creates a type of strict liability because a plaintiff does not have to show discriminatory intent. *Fallon*, 882 F.2d at 1217. Thus, "a successful affirmative defense to an EPA claim likewise serves as a valid defense to a claim based on Title VII." *Patkus v. Sangamon-Cass Consortium*, 769 F.2d at 1260 n. 5. Since the court already found that defendants successfully established a legitimate justification for the wage differential between Shannon and her male co-workers, the court does not need to separately analyze Shannon's Title VII claim. Defendants motion for summary judgment as to Shannon's Title VII claim is granted.

## II. Title VII Sex Discrimination and Retaliation Claims – Working Conditions

Shannon claims that defendants adversely changed her working conditions because of her sex and/or in retaliation for complaining about sex discrimination. She may prove this under either the direct or indirect method of proof. "The direct method of proof permits a plaintiff to show, by way of direct or circumstantial evidence, that [her] employer's decision to take an adverse job action against [her] was motivated by an impermissible purpose, such as sex." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727 (7th Cir. 1998)). Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach &*

*Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). In short, "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Rogers*, 320 F.3d at 753 (citation omitted). A plaintiff can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Under the indirect method of proof, the plaintiff bears the burden of producing evidence to establish a prima facie case of discrimination or retaliation. *Rhodes*, 359 F.3d at 504. If the plaintiff meets this burden, the employer must then articulate a legitimate, non-discriminatory reason for its action. If the employer offers a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to present evidence that the employer's proffered reason is a pretext for discrimination. Id.

To establish a prima facie case of sex discrimination, Shannon must produce evidence that (1) she belongs to a protected class; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated employee who was not a member of a protected class was treated more favorably. *Id.* To establish a prima facie case of retaliation, Shannon must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 642 (7th Cir .2002).

Shannon does not state whether she is proceeding under the direct or indirect method of

proof. The ambiguity of her approach makes no difference with regard to most of her working condition claims, however, because she fails to establish that an adverse employment action has taken place, an essential element of her claim under either method of proof. *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1029 (7th Cir. 2004) ("[W]hether a plaintiff proceeds under the direct or indirect method, evidence establishing an adverse employment action has actually taken place is an essential element of the claim.").

Shannon argues that she suffered actionable adverse employment actions when defendants discontinued her rental car; failed to provide her with a cellular telephone; assigned her a number of "demeaning" "clerical" tasks; threatened her with discharge if she did not obtain a car; failed to contribute to one of her pension plans; and when DuPont and Tamarin made "belittling" comments to her at meetings. None of these instances, individually or cumulatively, constitutes an adverse employment action. For purposes of Title VII, an adverse employment action is something

> more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices that might be unique to a particular situation.

*Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1034 n.13 (7th Cir. 2003) (quoting *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)); *see also Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000) (holding that adverse employment actions include significant changes in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits). An adverse employment action would not include inconveniences or events that "make . . . an employee unhappy." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Instead, "an employee must show that 'material harm has resulted from . . . the challenged

actions.'" *Traylor*, 295 F.3d at 788 (quoting *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir. 2001)).

Neither Local 1's discontinuation of Shannon's rental car nor its refusal to provide her with a cellular phone constitutes an adverse employment action. *See, e.g., Von Gunten v. Maryland*, 243 F.3d 858, 867 (4th Cir. 2001) (holding that employer's withdrawal of employee's state-owned vehicle is not an adverse employment action); *O'Neal v. Brownlee*, 2004 WL 2827052, at *5 (E.D. Pa. Dec 9, 2004) (holding that an employer's refusal to provide an employee with a rental car is not an adverse employment action); *Place v. Abbot Lab.*, 215 F.3d 803, 810 (7th Cir. 2000) (holding that the loss of a telephone and a cubicle were "too trivial to amount to an adverse employment action").

Shannon's allegation that Local 1 assigned her "demeaning" clerical tasks also does not constitute an adverse employment action. First, Shannon admits that these "tasks" were not permanent assignments but rather intermittent tasks. The Seventh Circuit has held that "mere[ly] temporary inconveniences . . . do not rise to the level of an adverse employment action." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). None of the tasks Local 1 assigned Shannon were more than temporary inconveniences. Moreover, even if assigning these tasks amounted cumulatively to a "transfer," they still do not constitute an adverse employment action. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (holding that an employer assigning an employee additional work outside the employee's normal job responsibilities does not constitute an adverse employment action); *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 885-86 (7th Cir. 1989) (holding that "humiliation" on being assigned a less prestigious position is not an adverse employment action); *Grayson v. City of Chicago*, 317 F.3d 745, 750 (7th Cir. 2003) (citing approvingly *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002), for the proposition that "an employee cannot establish an adverse action on the basis that a reassignment

deprives him of prestige").

Shannon also alleges that DuPont threatened to terminate her if she did not obtain a car. She does not claim, however, that she was discharged for that reason. Thus, DuPont's threat was not an adverse employment action. It is well-established that "unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII. *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004); *see also Aguilar v. St. Anthony Hospital*, 207 F. Supp. 2d 747, 756 (N.D. Ill. 2001) ("[A] threat of termination is not an employment action at all under the law."). For the same reason, Shannon's allegation that the International Union threatened her with termination if she failed to return certain alleged overpayments is not an adverse employment action.

Shannon also argues that Local 1's failure to make certain pension contributions on her behalf constitutes an adverse employment action. Shannon admits, however, that as a vested participant in the Pension Fund, Local 1's failure to contribute to the Pension Fund on her behalf will not affect Shannon's retirement benefits. From the Pension Fund, she will receive a monthly benefit of $182 at normal retirement age, based upon the entire period of her employment with Local 1 from 1992 to 2000, in addition to full benefits from the OEL fund. (Def. L.R. 56.1 ¶ 47 and Pl. Resp.) In the absence of any effect on her actual benefits, Local 1's failure to make contributions cannot constitute an adverse employment action.

Shannon's allegation that Tamarin and DuPont "belittled" her at staff meetings also fails to establish that she suffered an adverse employment action. Shannon is unable to recall any specific statements made by Tamarin or DuPont that she considered belittling. A bald assertion that Tamarin and DuPont made belittling comments, without any specific, concrete facts, is simply insufficient to defeat a motion for summary judgment. *See, e.g., Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004) ("[C]onclusory statements, not grounded in specific

facts, are not sufficient to avoid summary judgment."). Moreover, "belittling" statements, unless they are severe and pervasive, do not constitute adverse employment actions. *See Griffin*, 356 F.3d at 829-30 (holding that a supervisor's negative comments at staff meetings over a two-month period "may have created an 'unpleasant' environment, [but] these comments were not so severe and pervasive as to be actionable"); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir.1997) (holding that plaintiff did not suffer a materially adverse employment action when her boss "yelled at her [and] did not make her feel as if she was part of the work group"). Shannon has presented no evidence that Tamarin's and DuPont's belittling statements were severe or pervasive.

In light of these precedents, the evidence presented here is plainly insufficient to constitute an adverse employment action. None of these changes in Shannon's working conditions is actionable because none individually constitutes an adverse employment action. Even cumulatively these actions do not constitute an adverse employment action. Shannon's complaints seem relatively trivial when compared with other situations where courts have found that no adverse employment action took place. In *Griffin*, for example, the Seventh Circuit held that the following changes in an employee's working conditions were neither individually nor cumulatively adverse employment actions: changing the employee's shift; lengthening her commute by transferring her to another facility; unfairly disciplining her; issuing letters of warning; assigning her difficult cases; refusing to approve annual leave requests when work was backlogged; and giving her additional work that she perceived to be outside her normal responsibilities. 356 F.3d at 829-30. Thus, defendants' motion for summary judgment is granted as to each of the issues discussed above.

Shannon is on firmer legal ground when she contends that her assignment to service CPS cafeteria workers constituted an adverse employment action. Defendants argue that the CPS

assignment cannot constitute an adverse employment action because it involved no change in Shannon's salary or benefits. Title VII, however, does not limit adverse employment actions to strictly monetary consideration. "One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." *Collins v. State of Illinois*, 830 F.3d 692, 703 (7th Cir. 1987). Here, defendants admit that "nobody really wanted the schools" (Pl. St. of Add'l Facts ¶ 91) and do not challenge Shannon's perception that at least some of the schools were located in dangerous areas. These facts, viewed in the light most favorable to Shannon, suffice to show that Shannon's assignment to CPS constituted an adverse employment action. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 412 (3d Cir. 1999) (holding that employer's change of teacher's job assignments from physics teacher to general science teacher and transfer to a school which had the reputation of being "difficult" demonstrated that plaintiff was subjected to sufficient adverse employment action such that his Title VII claims for discrimination should have survived the initial, prima facie stage of the McDonnell Douglas analysis).

Relying solely on the supposed strength of their argument that Shannon did not suffer an adverse employment action when she was given the CPS assignment, defendants fail to make any argument that Local 1 has provided a legitimate, non-discriminatory reason for giving Shannon the CPS assignment. Thus, defendants have failed to meet their burden, and their motion for summary judgment is denied on this issue.

## II. Title VII Sex Discrimination and Retaliation Claims – Termination

Defendants contend that Shannon was terminated for refusing to accept the assignment to CPS. Refusal to accept an assignment is insubordination, "clearly a legitimate reason [] for discharge." *Hall v. Gary Community School Corp.*, 298 F.3d 672, 675 (7th Cir. 2002). Shannon does not dispute defendants' proffered justification for firing her. Instead, she argues that the

assignment to CPS was itself motivated by sex discrimination and/or retaliation and, though she fails to make the argument explicitly, apparently believes that defendants had no right to terminate her for refusing to accept the assignment.

This is not the case. Shannon could have voiced her concerns about what she believed to be a discriminatory assignment. She could have filed a charge of discrimination. In either case, she would have been protected from retaliation by Title VII's opposition clause. 42 U.S.C. 2000e-3(a). However, by refusing to perform her work assignment, even if she believed the assignment to be discriminatory, Shannon essentially removed herself from the protection of Title VII.[5] *See e.g., Smith v. Texas Dept. of Water Resources*, 818 F.2d 363, 365-66 (5th Cir.1987) (employer properly discharged engineering aide for refusing allegedly discriminatory assignment of secretarial relief work). As the First Circuit held in *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 230 (1st Cir. 1976), an employee is not immune from discharge merely by claiming that she was opposing a discriminatory practice, and an employer remains entitled to loyalty and cooperativeness from employees. The court specifically rejected an argument that the opposition clause immunizes any employee conduct arguably relevant to the employee's opposition to discrimination: "We doubt that Congress meant to go this far, particularly because an employee who feels that his employer has violated his rights under Title VII may pursue specific state and federal legal remedies for discrimination and need not rely on vigorous internal action directed against the employer." *Id.* at 231 n. 6. Thus, the court grants summary judgment for defendants on Shannon's Title VII termination claim.

---

[5]This would not be the case if the assignment presented "such an aggravated situation that a reasonable employee would be forced to resign," *see Clark* v. *Marsh,* 665 F.2d 1168, 1173 (D.C. Cir. 1981) (quoting *Bourque* v. *Powell Electrical Mfg. Co.,* 617 F.2d 61, 66 (5th Cir. 1980)), but Shannon makes no argument to that effect and thus waives it.

**ORDER**

For the reasons stated above, defendants' motion for summary judgment (#54) is granted in part and denied in part. The parties are directed to engage in a good faith effort to resolve this case. A status hearing is set for October 25, 2005 at 9:30 a.m.

Dated: September 22, 2005                    Enter: _____

                                             JOAN HUMPHREY LEFKOW
                                             United States District Judge